# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00741-CV

---

**E. E. and C. C., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY**
**NO. 18-FL-081, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING**

---

## O P I N I O N

E.E. (the mother) and C.C. (the father) appeal from the district court's order terminating their parental rights to C.A.C. (the child), who was five years old at the time of trial. The mother, in two issues on appeal, asserts that the district court erred in striking her jury demand and that the evidence is legally and factually insufficient to support the district court's finding that termination was in the best interest of the child. The father, in two issues on appeal, challenges the legal and factual sufficiency of the evidence supporting the district court's findings that he committed the statutory grounds for termination relating to endangerment, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), and compliance with a court order, *see id*. § 161.001(b)(1)(O), and that terminating his parental rights for failure to comply with a court order denied him due process. We will reverse the portion of the district court's order terminating the mother's parental rights and remand that portion of the cause to the district court

for further proceedings consistent with this opinion. We will otherwise affirm the district court's order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed suit for termination of the mother's and father's parental rights in February 2018. In a pretrial scheduling order filed on April 19, 2018, the district court set the case for an initial permanency hearing on August 9, 2018, and a "permanency before final hearing" on November 15, 2018. The order listed the trial date as "TBA." The scheduling order also specified that "all jury demands are to be filed on or before the date of the permanency before final hearing," i.e., November 15, 2018, and that "failure to file by that date will result in denial of jury trial." The dismissal date was scheduled for February 25, 2019. *See id*. § 263.401 (providing for dismissal of suit affecting parent-child relationship one year after suit is filed unless trial court commences trial on merits by that date or grants extension of time to continue case).

At the initial permanency hearing on August 9, 2018, the case was set for a bench trial before an associate judge on January 17, 2019. However, at the November 15, 2018, permanency hearing, the Department objected to the associate judge presiding over the trial. As a result, the January 17 trial setting was converted into an additional permanency hearing, and the Department was instructed to obtain a new trial setting from the district court.

The mother filed a jury demand on December 3, 2018, before any new trial date had been set.[1] The Department filed a motion to strike the jury demand, arguing that because the demand had been filed after the November 15, 2018 deadline specified in the scheduling order, it

---

[1] The father did not file a jury demand in the court below and does not complain on appeal that he was denied his right to a jury trial.

was untimely. At a hearing on December 19, 2018, an associate judge denied the mother's jury demand. Later, at the January 17, 2019 permanency hearing, the associate judge extended the dismissal date to August 24, 2019, with the final permanency hearing set for May 9, 2019, and trial set for July 18, 2019.

Meanwhile, the mother had requested and received a de novo hearing on the denial of her jury demand, which was held on February 14, 2019. At that hearing, the district court agreed with the associate judge that the mother's jury demand was untimely and granted the Department's motion to strike. The trial began on July 18, 2019, was recessed to a later date by agreement of the parties, and was continued and concluded on October 11, 2019.[2]

At the conclusion of trial, the district court found that termination of the mother's and father's parental rights was in the best interest of the child and that the mother and the father had committed multiple statutory grounds for termination. Specifically, the district court found that the mother and the father had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. *See id*. § 161.001(b)(1)(D), (E), (O). Additionally, the district court found that the mother had her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or

---

[2] The July 18, 2019 trial setting was recessed almost immediately after it began due to the unavailability of the attorney ad litem for the child and an attorney for the Department. Almost all the evidence in the case was admitted at the October 11 setting, except for brief testimony from the mother at the July 18 setting in which she stated her name, date of birth, and city of residence.

(E).  *See id*.  § 161.001(b)(1)(M).  Based on these findings, the district court terminated the parental rights of the mother and the father.  This appeal by each parent followed.

## THE MOTHER'S APPEAL

### Jury demand

In her first issue, the mother argues that the district court erred in striking her jury demand.  The mother acknowledges that her December 3, 2018 jury demand was filed after the November 15, 2018 deadline specified in the scheduling order.  However, she contends that the district court should have granted her jury demand because of the schedule changes that occurred at the November 15, 2018 and January 17, 2019 permanency hearings, which resulted in the trial date being moved to July 2019.  In response, the Department argues that the scheduling order "specifically identifies the November 15, 2018 date as the deadline and does not leave open the possibility of changing the deadline should other permanency [hearings] before final hearings be held."  The Department also asserts that the mother waived her right to a jury trial.

#### *Standard of review*

"We review the 'denial of a jury demand for an abuse of discretion.'"  *In re A.L.M.-F.*, ___ S.W.3d ___, 2019 Tex. LEXIS 426, at *17 (Tex. May 3, 2019) (quoting *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)).  "A trial court abuses its discretion when a 'decision is arbitrary, unreasonable, and without reference to guiding principles.'"  *Id*. (quoting *Mercedes-Benz Credit Corp.*, 925 S.W.2d at 666).  Moreover, "a trial court 'has no "discretion" in determining what the law is or applying' law to facts."  *Pressley v. Casar*, 567 S.W.3d 327, 333 (Tex. 2019) (quoting *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).  Accordingly, "a trial court abuses its discretion if it fails to correctly analyze or apply

4

the law." *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (orig. proceeding) (per curiam) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding)).

*Analysis*

This case involves two of the most sacred and precious rights protected by law—the right of a parent to the "companionship, care, custody, and management of her child," *Santosky v. Kramer*, 455 U.S. 745, 758 (1982), and the right of a litigant to a jury trial. Parental rights are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). They have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). Moreover, an order terminating parental rights is "complete, final, irrevocable and divests for all time that natural right as well as all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit." *Id*. "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Id*.

Similarly, "[t]he right to jury trial is one of our most precious rights, holding 'a sacred place in English and American history.'" *General Motors Corp. v. Gayle*, 951 S.W.2d 469, 476 (Tex. 1997) (quoting *White v. White*, 196 S.W. 508, 512 (Tex. 1917)). The Texas Constitution provides that "[t]he right to trial by jury shall remain inviolate," Tex. Const. art. I, § 15, and guarantees litigants the right to a jury trial "of all causes in the District Courts," *id*. art. V, § 10. Accordingly, the right to a jury trial in Texas has been characterized as "exceptionally broad," *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997), and any denial of that

right is "closely scrutinized," *City of Garland v. Dallas Morning News*, 969 S.W.2d 548, 558 (Tex. App.—Dallas 1998) (en banc), *aff'd*, 22 S.W.3d 351 (Tex. 2000); *see also G.W. v. Texas Dep't of Family & Protective Servs.*, No. 03-14-00580-CV, 2015 Tex. App. LEXIS 1330, at *6 (Tex. App.—Austin Feb. 11, 2015, no pet.) (mem. op.) ("The 'right to a jury trial as guaranteed by our Constitution is one of our most precious rights and the denial of that right is a very serious matter.'" (quoting *In re J.C.*, 108 S.W.3d 914, 917 (Tex. App.—Texarkana 2003, no pet.))).

To perfect one's right to a jury trial in a civil case, the rules require that a jury demand be filed in writing within "a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance." Tex. R. Civ. P. 216.[3] However, if a pretrial scheduling order establishes a different deadline for filing a jury demand than the thirty-day deadline in Rule 216, the scheduling order controls. *See Lindley v. Johnson*, 936 S.W.2d 53, 55 (Tex. App.—Tyler 1996, writ denied) (citing *ForScan Corp. v. Dresser Indus., Inc.*, 789 S.W.2d 389, 393 (Tex. App.—Houston [14th Dist.] 1990, writ denied)); *see also In re K.W.*, No. 12-14-00327-CV, 2015 Tex. App. LEXIS 1932, at *2–3 (Tex. App.—Tyler Feb. 27, 2015, pet. denied) (mem. op.). Thus, a jury demand filed after the deadline specified in a pretrial scheduling order is untimely. *See K.W.*, 2015 Tex. App. LEXIS 1932, at *3–4.

But filing an untimely jury demand does not necessarily mean that a party loses her right to a jury trial. The Texas Supreme Court has held that even when a jury demand is untimely, "a trial court should accord the right to jury trial if it can be done without interfering with the court's docket, delaying the trial, or injuring the opposing party." *Gayle*, 951 S.W.2d at 476; *see also Allen v. Plummer*, 9 S.W. 672, 673 (Tex. 1888) (holding that rules requiring that

---

[3] Rule 216 also requires the timely payment of a jury fee. *See* Tex. R. Civ. P. 216. However, that fee is not required if the party is indigent. *See id*. 217. In this case, it is undisputed that the mother is indigent.

jury demand be timely "are not strictly mandatory," and that failure to comply with such rules "does not forfeit the right to have a trial by jury, when such failure does not operate to the prejudice of the opposite party"). The Texas Supreme Court also has held that a jury demand that is untimely when filed can become timely if the trial setting is continued to a later date. *Halsell v. Dehoyos*, 810 S.W.2d 371, 371 (Tex. 1991) (per curiam). In such a situation, a trial court abuses its discretion in denying the jury demand unless the record shows that "the granting of a jury trial would operate to injure the adverse party, disrupt the court's docket, or impede the ordinary handling of the court's business." *Id.* at 371–72.

In this case, the mother's jury demand was filed on December 3, 2018, which was after the November 15, 2018 deadline specified in the scheduling order. However, at the permanency hearing held on November 15, the schedule changed. The trial that had been set for January 17, 2019, was converted into an additional permanency hearing, and at the time the mother filed her jury demand, no new trial date had been set. Moreover, at the time the district court ultimately struck the mother's jury demand, at the de novo hearing on February 14, 2019, the dismissal date of the case had been extended to August 24, 2019, the "permanency [hearing] before final order" had been set for May 9, 2019, and the trial on the merits had been set for July 18, 2019. Thus, the mother's jury demand, although "untimely" according to the scheduling order, was, for all practical purposes, filed several months before the final permanency hearing, the trial on the merits, and the dismissal date.

To deny the mother her right to a jury trial under these circumstances, absent any showing of harm to the Department or disruption to the trial court's docket, is contrary to the law as announced by the Texas Supreme Court in *Gayle* and *Halsell*, *supra*. The Department had the burden to show harm, *see Gayle*, 951 S.W.2d at 477; *Halsell*, 810 S.W.2d at 371, but nothing in

7

the record indicates that granting the mother her right to a jury trial in this case would have interfered with the court's docket, delayed the case, or injured the Department in any way. Accordingly, on this record, we must conclude that the district court abused its discretion in denying the mother's request for a jury trial. *See Gayle*, 951 S.W.2d at 476–77; *Halsell*, 810 S.W.2d at 371–72; *In re J.N.F.*, 116 S.W.3d 426, 436 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re M.B.*, Nos. 05-19-00971-CV & 05-19-00973-CV, 2019 Tex. App. LEXIS 8496, at *10–11 (Tex. App.—Dallas Sep. 19, 2019, orig. proceeding) (mem. op.) (concluding that jury demand was timely despite being filed after deadline specified in scheduling order because trial setting was moved to later date); *In re J.M.B.*, No. 05-16-01311-CV, 2017 Tex. App. LEXIS 3892, at *4–8 (Tex. App.—Dallas April 27, 2017, no pet.) (mem. op.) (concluding that trial court abused its discretion in denying mother jury trial when request was filed more than six months before trial setting); *G.W.*, 2015 Tex. App. LEXIS 1330, at *6–7 (concluding that trial court abused its discretion in denying jury trial when request was made "more than a month prior to the trial setting" and Department failed to present any evidence showing that granting jury trial would have injured Department or disrupted trial court's docket); *In re P.L.G.M.*, No. 02-13-00181-CV, 2013 Tex. App. LEXIS 13755, at *11–13 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op.) (concluding that trial court abused its discretion in denying jury trial when trial court had extended case's dismissal date and granted continuance).

### *Waiver*

We must also address the Department's assertion that the mother waived her right to a jury trial. The Department contends that to avoid waiver, the mother was required to either file a new jury demand after the case was extended or to renew her demand immediately before

the bench trial began. There is a line of cases holding that "when a party has perfected its right to a jury trial in accordance with Rule 216 but the trial court proceeds to trial without a jury, the party must, to preserve error, either object on the record to the trial court's action or indicate affirmatively in the record it intends to stand on its perfected right to a jury trial." *Sunwest Reliance Acquisitions Group, Inc. v. Provident Nat'l Assur. Co.*, 875 S.W.2d 385, 387–88 (Tex. App.—Dallas 1993, no writ); *see In re K.M.H.*, 181 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *In re D.R.*, 177 S.W.3d 574, 580 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *In re A.M.*, 936 S.W.2d 59, 61 (Tex. App.—San Antonio 1996, no writ); *see also Gammill v. Texas Dep't of Family & Protective Servs.*, No. 03-08-00140-CV, 2009 Tex. App. LEXIS 3800, at *10 (Tex. App.—Austin May 22, 2009, pet. denied) (mem. op.). "This is because 'the right [to a jury trial] in a civil case is not self-executing: to invoke and perfect the right to a jury trial in a civil case a party must first comply with the requirements of rule 216'; once perfected, 'the right to a jury trial still may be waived expressly or by a party's failure to act.'" *Vardilos v. Vardilos*, 219 S.W.3d 920, 923 (Tex. App.—Dallas 2007, no pet.) (quoting *Sunwest Reliance*, 875 S.W.2d at 387–88).

However, there are other cases holding that to avoid waiver, a party must simply obtain an adverse ruling from the trial court on her jury demand. *See McKern v. McCann*, 675 S.W.2d 222, 223–24 (Tex. App.—Austin 1984, writ ref'd); *Coleman v. Sadler*, 608 S.W.2d 344, 346–47 (Tex. App.—Amarillo 1980, no writ). This is because "[t]he trial court's adverse ruling on the jury demand remove[s] the jury trial alternative and, in effect," leaves the party "without a conscious choice between a jury and non-jury trial." *Coleman*, 608 S.W.2d at 346; *see also Trapnell v. Sysco Food Servs.*, 850 S.W.2d 529, 547 (Tex. App.—Corpus Christi 1992) ("Merely proceeding to trial in a case in which a trial by jury is unavailable, without more, does not

9

establish waiver of that right."), *aff'd*, 890 S.W.2d 796 (Tex. 1994). *Cf. Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) ("Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances."); *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987) ("Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.").

Under either line of cases, the mother preserved her right to a jury trial. Consistent with the *Sunwest Reliance* line of cases, the record reflects that the mother took "affirmative action" to preserve her right to a jury trial—she objected to the associate judge's denial of her jury demand by requesting and receiving a de novo hearing on the matter from the district court. Consistent with *McKern* and *Coleman*, the mother obtained an adverse ruling from the district court on her jury demand following the de novo hearing. The adverse ruling removed the possibility of a jury trial and thus left the mother with no choice but to proceed with the bench trial as required by the district court. On this record, we cannot conclude that the mother waived her right to a jury trial by participating in the bench trial. *See McKern*, 675 S.W.2d at 223–24; *Browning v. Holloway*, 620 S.W.2d 611, 617 (Tex. App.—Dallas 1981, writ ref'd n.r.e.); *Coleman*, 608 S.W.2d at 346; *see also Brubaker v. Brubaker*, No. 03-18-00273-CV, 2019 Tex. App. LEXIS 10062, at *9 (Tex. App.—Austin Nov. 21, 2019, no pet. h.) (mem. op.) (concluding that party "did not waive his right to a jury trial by participating in the bench trial after the trial court impliedly overruled his objection to removal of the cause from the jury docket, and the record [did] not indicate that he otherwise knowingly waived his right to a jury trial"); *Edmond v. Mark McElhannon/Accent Real Estate Servs.*, No. 03-17-00760-CV, 2018 Tex. App. LEXIS 5365, at *3 (Tex. App.—Austin July 17, 2018, no pet.) (mem. op.) ("An

10

appellant may preserve his right to a jury trial despite announcing 'ready' at the opening of a bench trial if he has taken other affirmative action to show he did not intend to waive his right to a jury trial.").

### *Harm*

We must next determine if the mother was harmed by this error. "A refusal to grant a jury trial is harmless error only if the record shows that no material issues of fact exist and an instructed verdict would have been justified." *Halsell*, 810 S.W.2d at 372; *J.N.F.*, 116 S.W.3d at 437. As we explain in our discussion of the mother's second issue, there were material fact issues as to whether termination of the mother's parental rights was in the best interest of the child, and accordingly, the Department would not have been entitled to an instructed verdict. *See J.N.F.*, 116 S.W.3d at 437. Therefore, we conclude that the mother was harmed by the district court's improper denial of her jury demand and is entitled to a new trial before a jury.

We sustain the mother's first issue.

## Best-interest finding

In her second issue, the mother asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of her parental rights is in the best interest of the child. We need not address her factual-sufficiency challenge, because even if we were to sustain that challenge, the remedy would be a new trial, and we have already determined that the mother is entitled to a new trial due to the improper denial of her jury demand. *See In re M.A.*, No. 14-05-00579-CV, 2007 Tex. App. LEXIS 7917, at *8 (Tex. App.—Houston [14th Dist.] Oct. 4, 2007, no pet.) (mem. op.); *see also* Tex. R. App. P. 47.1. However,

we must address the mother's legal-sufficiency challenge, because sustaining that challenge would result in rendition of judgment in favor of the mother. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re L.N.C.*, 573 S.W.3d 309, 315 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

### Standard of review

The district court may order termination of the parent-child relationship "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id*. at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20).

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its

12

finding if a reasonable factfinder could do so." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631.

### Analysis

The best-interest prong of the termination statute "is child-centered and focuses on the child's well-being, safety, and development." *Id.* When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *See* 544 S.W.2d 367, 371-72 (Tex. 1976); *see also A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The Department need not prove all the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27; *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). Moreover, a parent's statutorily offensive conduct is often intertwined with the best-interest determination, and the same evidence may be probative of both issues. *See A.C.*, 560 S.W.3d at 631–32; *C.H.*, 89 S.W.3d at 28; *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

**The mother's conduct**

The district court heard evidence that on July 30, 2017, at approximately 2:00 a.m., Patrol Sergeant Kyle McConnell of the Caldwell County Sheriff's Office was dispatched to the mother's residence in response to a domestic disturbance. McConnell testified that upon his arrival at the residence, the mother told him that the father had showed up at the residence with a machete or a knife in his possession and had "chased after [the mother's boyfriend] with a knife." The mother also told McConnell that during the incident, the father had told his son to "get a gun."

McConnell testified that after further investigation, he suspected that the mother was lying to him about her boyfriend's involvement in the incident. According to McConnell, "[The mother] told me that [the boyfriend] was not involved at first and that he didn't live there," but the owner of the property told McConnell that the boyfriend lived there. McConnell also suspected that the mother might be using marijuana. McConnell explained, "She didn't appear to be under the influence of anything at the time, but she had told me that there was marijuana on the property, that it belonged to her, and she used it." When asked how frequently the mother used marijuana, McConnell testified, "She used a lot. That's what she told me." However, the mother also told McConnell that she did not use marijuana around her three children, who were at the residence at the time of the disturbance.

Following this incident, the mother was referred to the Department. The mother's case was assigned initially to Child Protective Services (CPS) caseworker Evelyn Johnson, who testified that the Department was concerned with the mother's mental health, drug use, and allegations of domestic violence between the mother and her boyfriend. Based on these concerns, the mother was ordered to complete family-based safety services, which included "a

mental health evaluation, follow through with all the recommendations made by that mental health professional, complete a drug and alcohol assessment, complete random drug testing and then just comply with all of The Department's requirements in general." Those requirements included a prohibition on the mother's boyfriend being around the mother's children.

In February 2018, the Department sought conservatorship of the child when the mother, according to Johnson, "did not comply with really any of her court ordered services," including the required drug tests. Additionally, the mother's oldest child told Johnson that the mother's boyfriend was now living with the mother in Austin. When the Department attempted to locate the mother's residence, they were unable to do so until the oldest child provided the Department with the mother's address.

While the mother was living with her boyfriend, the mother sent her two older daughters to live with the mother's brother and sent her youngest daughter (the child subject to this suit) to live with the mother's sister.[4] Based on a criminal background check that it had run on the mother's sister, the Department did not agree with the child's placement there and requested and received an emergency removal of the child from the sister's home.[5]

The mother's case was assigned next to Flora Villegas, a conservatorship caseworker for CPS. Villegas testified that the Department prepared a family plan of service for the mother that included random drug testing, protective-parenting classes, individual therapy, a psychiatric evaluation and treatment if necessary, communication with the Department, and domestic-violence services. The mother completed some of the services but failed to complete

---

[4] The mother's parental rights to her older daughters were terminated in a separate proceeding.

[5] Johnson testified that the sister had a "significant criminal history," although she could not recall the details of that history.

15

others. She was discharged unsuccessfully from therapy on two occasions; she completed two drug and alcohol assessments and completed an intensive outpatient program but failed to complete the "aftercare" program (i.e., Narcotics Anonymous); and she completed the majority of her parenting classes but failed to complete the substance-abuse portion of the classes.

Villegas also testified that the mother "continues to engage" with her boyfriend, who was arrested in July 2019 for attacking the mother and charged with the offense of assault by strangulation. According to Villegas, the day after the boyfriend was arrested, the mother called the boyfriend in jail, and they "continued [to] talk about their relationship and how they wanted to work it out and be together."

Villegas also believed, based on the mother's statements to her, that the mother continued to use marijuana, and Villegas testified that the mother had been banned from two different drug-testing facilities due to her "behavior."[6] Villegas also had difficulty maintaining contact with the mother because the mother failed to return Villegas's phone calls and text messages.

**The emotional and physical danger to the child now and in the future**

Licensed professional counselor Tina Nunnellee provided counseling services to the mother. Nunnellee testified that the mother told her that she had been diagnosed with depression, bipolar disorder, and borderline personality disorder. Nunnellee testified that the mother had been prescribed medication to treat those conditions, but the mother told her "that she didn't like the way the medication made her feel and she chose to medicate herself with other substances." Nunnellee opined that without taking the medication, the mother would be unable

---

[6] Villegas did not specify the nature of the mother's behavior that led to her being banned from the facilities.

to treat her conditions. During the case, the mother had only four sessions with Nunnellee because the mother "made herself unavailable for therapy" and had to be discharged. Nunnellee had also worked with the mother on a prior CPS case, and she testified that in the prior case, the mother had made progress maintaining a "drug-free status." However, in this case, Nunnellee "[d]id not recognize [the mother] as the same person physically or mentally." Nunnellee explained, "[T]he drug use that she admitted to having done had altered her physically, her health was not good. And her mental state was unstable at best." According to Nunnellee, because the mother refused to take her medication, it was unadvisable for her to be a primary caregiver to a young child. She testified,

> If she's not taking her medication, she could go off on a manic phase or a depressive phase, be a danger to herself, be a danger to this child, not pay appropriate attention to the child. If she is smoking marijuana or doing any other, you know, types of drugs again she's going to be less capable of tending to a child. And the younger the child the more danger to the child.

The mother also received therapy from Susan Chiu, a clinical therapist who testified on the mother's behalf. Although the mother failed to complete her sessions with Chiu and again was discharged unsuccessfully, Chiu testified that the mother had "made progress from a therapeutic standpoint throughout [their] counseling relationship" and that "her ability to manage her emotions was greatly improved the last time I saw her." Based on this progress, Chiu believed that the mother could be a positive presence in the child's life and that she was "entirely capable of parenting her child."

17

**The plans for the child by the agency seeking custody and the stability of the proposed placement**

The child's current placement is with her foster mother, "Sarah,"[7] with whom the child has lived since January 2019. Sarah is also the placement for the child's two older sisters. Sarah testified that when the child first arrived at the home of Sarah and her husband, "She was sweet. She called us mom and dad immediately on her own." However, Sarah also noticed that the child "was scared to be alone at all. She would also say that everyone hates her. She was stupid and ugly. Really low confidence." To improve the child's confidence and self-esteem, Sarah had enrolled the child in therapy and also engaged in positive self-talk with the child, having the child tell herself that she is "beautiful," "kind," and "smart." Sarah testified that she wants to adopt the child.

Caseworker Villegas testified that the Department's primary permanency goal for the child is adoption by the current placement. Villegas testified that the placement provided the child with "stability," "structure," and "a loving, caring home" where she can live with her older sisters and "have positive confidence in herself." Moreover, the foster parents "work with her emotional state and they provide that safe bonding for her that's consistent."

**The child's physical and emotional needs**

Caseworker Johnson testified that during the first visit she observed between the mother and the child, the child "actually like held onto me" and "begged me not to leave." This "alarmed" Johnson, who explained that she "never had a child hold onto me and beg me not to leave them."

---

[7] We refer to the foster mother using an alias. *See* Tex. R. App. P. 9.8.

Licensed professional counselor Peggy Vanelli provided counseling services to the child. Vanelli testified that she engaged in play therapy with the child during their thirteen sessions together and that during play, the child would cry, show fear, and pretend that she was trapped in a house and that "someone needed to help her." Vanelli believed that the child's behavior "seemed like a pattern that showed some trauma that had happened to her," "[p]robably . . . something going on that she felt like she couldn't get out of a room or a house or that she was trapped somewhere." On one occasion, the child "did a play where she put several of the puppets in a closet and said it was dark in there," which "kind of raised a red flag" for Vanelli. On another occasion, the child "described anger as someone using their fists against each other, someone using their arm and throwing everything off of a table as a way that she had seen anger. And a lot of yelling." Vanelli believed that the child was "describing something that had happened to her in her biological home."

Vanelli also testified that the child had low self-esteem and that the child would tell her foster mother, "Nobody loves me. And nobody cares about me." Vanelli believed that the child "needs consistency" and "needs someone who is going to be there on a regular basis for her." Vanelli also believed that the child should be in a home "that is consistent, that is loving, that is stable, that is going to be a place where she can grow." According to Vanelli, the child's current placement provides that stability and consistency.

**The stability of the mother's home and her parenting abilities**

Villegas testified that the mother reported living with her boyfriend from February 2018 until December 2018, had been homeless for four months after that, then reported

19

an address in Bastrop that Villegas was unable to visit, and had been in her current apartment for three months. The mother told Villegas that the apartment belonged to her brother and his wife.

Villegas had concerns regarding the mother's parenting abilities. Although the mother had completed most of her parenting classes, she had failed to make important behavioral changes, specifically finding coping mechanisms that did not involve the use of illegal substances. Villegas believed that the mother's lack of coping skills adversely affected her ability to engage in more appropriate relationships and communicate effectively with the child.

Villegas further testified that the mother's visits with the child were "inconsistent" and that the mother had missed five scheduled visits with the child, including three recent visits after the trial began in July. Vanelli, the child's therapist, testified that on the occasions when the mother would miss visits, the child seemed anxious and "more clingy" with Sarah. Vanelli also testified that the failure of a parent to be consistent in her visits with a child raised a red flag in her mind regarding that person's ability to be a parent on a full-time basis.

Sarah, the foster mother, had interacted with the mother on several occasions and expressed concerns regarding the mother's ability to care for the child. When asked to describe her concerns, Sarah testified, "The fact that she isn't trying to work treatment. She continues to use drugs and be in a relationship with someone who is unsafe. As well as the things like missing the visits. I mean when you're a mom you can't just choose not to show up. And it affects [the child]." Sarah explained that the child has a "better relationship now" with the mother than when the case began, but the child had been "really hurt by [the mother] not showing up" for visits. Sarah added that on the occasions when the mother missed visits, the child "doesn't feel like she's loved" and engaged in more negative self-talk.

20

**Conclusion regarding legal sufficiency**

In summary, the mother presented some evidence that was favorable to her, including the testimony of Susan Chiu that the mother had "greatly improved," had made progress in her therapy, and was "entirely capable of parenting the child." This evidence created material fact issues as to whether termination was in the best interest of the child, and thus the mother was harmed by the denial of her jury demand. However, regarding the mother's sufficiency challenge, the Department presented evidence that the mother used marijuana both before and after the case began, used that illegal drug as a "coping mechanism" for problems in her life and had failed to develop healthier coping skills, continued to engage in a romantic relationship with a man who had assaulted her, refused to take prescribed medication to treat her mental health, was discharged unsuccessfully from her court-ordered therapy on two occasions, and missed multiple scheduled visits with the child. Additionally, the Department presented evidence that the child suffered from low self-esteem, which was exacerbated by the mother's missed visits, and that the child's current placement provided her with "stability," "structure," and "a loving, caring home" where the child can live with her older sisters and "have positive confidence in herself." Viewing this evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that termination of the mother's parental rights was in the best interest of the child. Accordingly, the evidence is legally sufficient to support the district court's finding.

We overrule the mother's second issue.

# THE FATHER'S APPEAL

In his first issue, the father asserts that the evidence is legally and factually insufficient to support the district court's findings that he endangered the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). In his second issue, the father asserts that the evidence is legally and factually insufficient to support the district court's finding that he failed to comply with the provisions of a court order that provided for the return of the child, *see id*. § 161.001(b)(1)(O), and that terminating his rights based on that ground denied him due process.

## Endangerment

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," *id*. § 161.001(b)(1)(D), or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id*. § 161.001(b)(1)(E). Both subsections (D) and (E) require proof of child endangerment, i.e., "exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being." *A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct." *Id*. "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually

22

suffers injury.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533); *see also In re E.N.C.*, 384 S.W.3d at 803.

"'Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act.'" *A.C.*, 577 S.W.3d at 699 (quoting *Asjes v. Texas Dep't of Protective & Regulatory Servs.*, 142 S.W.3d 363, 370 (Tex. App.—El Paso 2004, no pet.)). "Termination under this subsection must be based on more than a single act or omission; instead, 'what is required is a voluntary, deliberate, and conscious course of conduct.'" *In re M.D.M.,* 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). In reviewing the sufficiency of the evidence under subsection (E), we "consider conduct both before and after the Department removed the child from the home." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

"A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id*. Thus, "evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child." *Id*. at 360–61. Conduct that is indicative of "[d]omestic violence, want of self-control, and propensity for violence" may also be considered. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "A factfinder may also infer that a parent's lack of contact with the child and absence from the child's life endangers the child's emotional well-being." *M.D.M.*, 579 S.W.3d at 765 (citing *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.)); *see In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (concluding that parent's criminal

23

conduct, which resulted in parent's imprisonment and absence from child's life, created "emotional vacuum" in child's life that endangered child's well-being). Similarly, a parent's "lack of demonstrated concern" for his child's well-being is further evidence of endangerment. *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also M.C.*, 917 S.W.2d at 270 ("Neglect can be just as dangerous to the well-being of a child as direct physical abuse.").

On this record, we conclude that the evidence is sufficient to support the district court's finding under subsection (E) that the father engaged in conduct that endangered the child. The district court heard evidence, summarized above, that this case began when the police were dispatched to the mother's residence in response to a domestic disturbance that involved the father showing up at the mother's residence at approximately 2:00 a.m., chasing the mother's boyfriend with a knife, and asking his son to "get a gun." The father's child was at the residence when this incident occurred. Although no criminal charges were filed based on this incident, a protective order was later entered against the father, a copy of which was admitted into evidence. The protective order included findings by the district court that the father "has committed family violence," that "family violence is likely to occur in the future," and that the father "has engaged in conduct that constitutes stalking under Texas Penal Code 42.072." *See* Tex. Penal Code § 42.072 (defining stalking as knowingly engaging in conduct, committed "on more than one occasion," that constitutes offense of harassment and that "the actor knows or reasonably should know the other person will regard as threatening"). The protective order, which was signed on December 14, 2017, prohibited the father from having any contact with the child until November 1, 2019. Thus, as a result of the father's conduct, he would be absent from the child's life for

approximately two years, which the district court could have reasonably inferred had endangered the child's emotional well-being.

Additionally, the district court heard evidence tending to show that after the case began, the father exhibited a "lack of demonstrated concern" for the child. Caseworker Villegas testified that after she initially made phone contact with the father in March 2018, she "attempted to set up several face to face meetings" with the father but "[h]e did not make them." After that, Villegas and the father had "several text exchanges," but the father eventually "stopped communicating" with Villegas. Her last phone call with the father was in November 2018, almost one year before the October 2019 trial. Villegas testified that since that time, the father "has not been engaged with The Department, has not asked in regards to [the child]." Villegas acknowledged that there was a protective order in place that prohibited the father from having contact with the child, but according to Villegas, "he has not attempted to even get to know what's going on with his daughter. And he hasn't attempted to do any type of services or try to communicate in any way." Villegas testified that the father's failure to communicate with the Department led her to believe that the father "does not want [the child] in his life." She explained:

> A parent that is worried and caring about their child asks at least—even if he can't see the child, you're asking about him, how they're doing, are there—is there anything that I can provide for them? Even if I can't see them, maybe can I provide, you know, Christmas presents, birthday presents, clothing for the new school year, backpack. [The father] did not do any of that.

Viewing the above evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that the father engaged in conduct that endangered the physical or emotional well-being of the child.

25

*See* Tex. Fam. Code § 161.001(b)(1)(E); *S.M.L.*, 171 S.W.3d at 479–80; *In re M.J.M.L.*, 31 S.W.3d 347, 352 (Tex. App.—San Antonio 2000, pet. denied). Accordingly, the evidence is legally sufficient to support the finding.

We also conclude that the evidence is factually sufficient. In a factual-sufficiency review, the appellate court considers disputed evidence in the record. *See A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

Here, the father presented some evidence that the mother might have lied in her account of the events that led to the issuance of the protective order against him, specifically as to the extent of her boyfriend's involvement in the incident. The father also presented some evidence that he was concerned for the child's well-being. Specifically, Villegas testified that in her November 2018 phone call with the father, the father told Villegas that he wanted the child to be adopted by his sister. However, we cannot say that the disputed evidence in the record is "so significant" that a reasonable factfinder could not have formed a firm belief or conviction that the father engaged in conduct that endangered the child.

Because we conclude that the evidence is legally and factually sufficient to support the district court's finding under subsection (E), we need not consider the father's second issue relating to subsection (O). *See N.G.*, 577 S.W.3d at 237 n.1; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule the father's first and second issues.

**CONCLUSION**

We reverse the portion of the district court's order terminating the parental rights of the mother and remand that portion of the cause for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d). We instruct the district court to commence any new trial on remand no later than 180 days after the mandate is issued by this Court. *See id*. 28.4(c); *see also* Tex. Fam. Code § 263.401(b-1). We otherwise affirm the district court's order of termination.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed in Part; Reversed and Remanded in Part

Filed: February 28, 2020